In re Eugene W. **EDWARDSON** and Clara A. Edwardson, d/b/a Gene's Electronics and Sound Service, formerly d/b/a Gene's Radio and TV, Debtors.

Bankruptcy No. 87–05004.

United States Bankruptcy Court, D. North Dakota.

June 3, 1987.

Roger Minch, Fargo, N.D., for First American Bank.

Norman Anderson, Fargo, N.D., for FmHA/USA.

Sheldon Smith, Bismarck, N.D., for debtors.

Phillip Armstrong, Minot, N.D., trustee.

Jonathan Fay, Fargo, N.D., for Erickson Implement.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a confirmation hearing on the Modified Chapter 12 Plan of Eugene and Clara Edwardson (Debtors). The Debtors filed their Chapter 12 petition on January 2, 1987, and filed their Chapter 12 Plan on April 2, 1987. On May 12, 1987, the Debtors filed a Modified Chapter 12 Plan. The modified plan principally incorporates values as determined by the court at an April 28, 1987, valuation hearing. The modified plan also changes interest rates and payback periods of various secured creditors. The confirmation hearing was held on May 12, 1987. On May 18, 1987, pursuant to this court's instructions at the confirmation hearing, the Debtors filed a Modified Chapter 12 Plan (Second Modification), which made minor non-substantive corrections to the Modified Chapter 12 Plan, including specifying the

exact sums and dates of proposed plan payments, and providing that a ten percent trustee's fee be applied to all plan payments. The Modified Chapter 12 Plan (Second Modification) addresses all concerns raised by the United States Trustee. Thus, the sole objecting party is First American Bank and Trust of Carrington (Bank), who raised a litany of objections to the first plan and persists in and has added to its objections, subsequent to the filing of the May 18, 1987, plan. The Bank's principal objection is that an interest rate of 8% is unsatisfactory and that the plan is not feasible.

Based upon the evidence presented at the hearing, the court finds the material facts to be as follows:

## Findings of Fact

The Debtors farm six quarters of land and also have a small electronic business. Five quarters of the land are owned by the Debtors and one quarter is leased by the Debtors from the Debtor's son and the son's grandmother. The Debtors get twenty-five percent of the income from the leased quarter and the Debtor's son, Steve, and the grandmother obtain the remaining portion. Although Eugene Edwards manages the day-to-day operation of the farm, his son, Steve, is most familiar with the business aspect of the operation. Steve has a bachelors of science degree in mechanized agriculture and a masters degree in mechanized agriculture and ag economics, both from N.D.S.U. Steve is a farm manager assistant with the North Dakota Extension Service and is currently developing a computerized crop model for production expenses. While Steve is not actively farming, his knowledge and expertise is valuable to the Debtors' reorganization efforts.

The Debtors and the Bank both have developed projected cash flows for 1987. These cash flows can be summarized as follows:

| Cash In Flows | Debtor | Bank |
|---|---|---|
| Wheat | $49,404.00 | $30,610.00 |
| Other Grains | $11,690.00 | $ 7,455.00 |
| Miscellaneous | $ 800.00 | –0– |
| Electronics | $ 5,700.00 | $ 3,600.00 |
| Farm Program | $28,040.00 | $24,735.00 |
| Total Cash In Flows | $95,634.00 | $66,400.00 |

Projected Cash Out Flows, less plan and interest payments, are as follows:

$56,221.19    $47,383.00

Based upon these figures, the net projected dollars available to fund a plan are as follows:

$39,412.71    $19,017.00

Obviously, some variation is inherent in any cash flow projection for a farm operation. The principal variation between the Bank's projections and that of the Debtors' is the projected gross income. Approximately $20,000.00 of the $30,000.00 discrepancy comes from projected wheat income alone, largely attributable to the average yields which the parties' used. Steve Edwardson testified that wheat income is calculated as follows:

534.1 acres @ 37 bu./acre @ $2.50 per bu. = $49,404.25.

Brad Turner, the ag loan officer with the Bank, who also made a cash flow projection, used a 28 bushel per acre projection in his calculations, contending that it is a historical average for the Debtors. This average, however, does not adjust for severe hail losses which occurred during several previous years. Turner testified that if managed properly, the Debtors' farm will average 37 bushels per acre. Because the Debtors will be fully insured against hail loss, carrying both federal crop insurance and hail insurance, the 37 bushel average is a reasonable yield to use in making income projections. For example, in 1986 Steve did an economic yield count before being hailed out and projected a 37 to 47 bushel per acre yield, with 40 bushel being average. The Debtors, with the assistance of their son, appear to have the management ability to meet the 37 bushel per acre average.

The Debtors' projections were based on 14% protein wheat selling for $2.50 per bushel. At the date of the hearing, the market had increased to $2.80 per bushel. Under the farm program, the Debtors' deficiency payments are based on a 25 bushel per acre county average yet their projections are for 37 bushels per acre. Thus, a

thirty cent per bushel increase in the wheat price is offset somewhat by a decline in government payments. Although the facts are not completely clear, the court finds that for each dollar increase in the Debtors' gross income from wheat sales, based on an increase in price per bushel, and not an increase in price due to higher protein, the Debtors' wheat deficiency payment under the farm program would decline approximately sixty-five cents. Thus, in actuality the Debtors will receive a net benefit of approximately thirty-five cents per bushel for each dollar increase in the price of wheat.

The Debtors' projections are also based on a conservative protein level of 14%. A dollar premium is currently being paid for wheat with a protein level of 15%. Steve Edwardson testified that the Debtors' average protein is between 14.8% and 15.2%. This testimony was not disputed or contradicted by the Bank. Thus, the court finds that the Debtors' average protein level for wheat raised is 15%. This being the case, the Debtors' projections are conservative in that they may well realize additional income from wheat production, above their cash flow, in the following amount: 534.1 acres @ 37 bu. per acre @ $((.35 \times .30) + 1.00) = \$21,836.68$. The adjustment for an increased protein level and increased price of wheat would increase the gross grain sales and government payments income from the six quarters from $89,134.60 to $110,971.28. After making an adjustment for the Debtors' twenty-five percent share of income derived from the leased quarter, the court finds that the Debtors' annual crop production, based on the evidence before the court, on the average will gross $97,099.87. This would adjust the total cash in-flow projected by the Debtors to $103,600.00.

David Watt, an assistant professor in agricultural economics at North Dakota State University, who holds masters and doctorate degrees in agricultural economics, has examined the Debtors' cash flow projections. Watt, while having not visited the Debtors' farm, has asked Eugene and Steve various questions about their operation. Although Watt is a former instructor of Steve, and somewhat professionally associated with him, the court puts some value on his testimony and opinion. Based upon his discussion with the Edwardsons, Watt believes that the Debtors' cash flow figures are conceivable and that economic ratios as derived from the cash flow indicate that the income and expenses are reasonable. Watt also testified that a truer economic picture of a debtor's cash flow for a particular year can be derived by making calculations based upon current prices and input determinations as contrasted with historical averages.

At the time Steve Edwardson graduated from college in approximately 1984 or 1985, he was considering farming with his father. His father was in bad health at that time, although the health problems have since been remedied. These circumstances caused the Debtors to list all government payments in Steve's name. Steve, for economic reasons, was unable to get into farming as he had planned. However, the payments are still being made to Steve, who historically has turned them over to his father. Steve testified that he will continue to give his father all of the future government farm payments, as he has apparently been doing in the past. The court is also of the impression that Steve's share of the rental income is somewhat flexible, and, in a bind, may be available to his father to cover production costs. Steve testified that he is willing to help his father out financially, if needed, although the court does not know the extent of his ability to do so.

On April 7, 1987, the Bank commenced a nondischargeability action against the Debtors pursuant to section 523(a)(4) and section 523(a)(6) of the Bankruptcy Code. The Bank alleges that the Debtors used 6,764.63 bushels of wheat secured by the Bank to satisfy shortfalls in a government re-sale program, and that the Debtors converted $11,156.55 from sale of 1986 grain encumbered to the Bank. At the confirmation hearing, Eugene Edwardson testified that the Bank did not object to repayment of the government with grain secured to the Bank. The Debtor also testified that he sold the 1986 grain upon the advice of

legal counsel that the Bank's security interest did not attach to it.

The Debtors propose to treat the secured creditors as follows:

| Creditor | Secured Amount | Term of Payment | Interest Rate | 11–30–87 Payment | Nov. 30 Annual Payments |
|---|---|---|---|---|---|
| First American Bank (real estate) | $99,214.00 | 30 yrs. | 8% | $4,407.00 | $8,813.00 |
| First American Bank (machinery) | $18,450.00 | 10 yrs. | 8% | $1,375.00 | $2,750.00 |
| FMHA (real estate) | $98,069.86 | 34 yrs. | 8.25% | $4,459.00 | $8,918.00 |
| Ford (pick up) | $ 8,330.00 | 5 yrs. | 6.0% | $1,978.00 | $1,978.00 |
| Federal Land Bank | $65,458.14 | 25 yrs. | 9.5% | $3,468.00 | $6,935.00 |
| TOTAL | | | | $15,687.00 | $29,394.00 |

The Debtors' cash flow also indicates a $1,607.72 payment for unpaid real estate taxes. However, in calculating the value of the Bank's secured claim on real estate, the figures seem to indicate that the Debtors have a $1,786.00 obligation for unpaid real estate taxes. The Debtors' plan refers to the real estate tax claim, but does not provide for treatment thereto. The Debtors also propose to pay the United States Trustee ten percent of all plan payments for three years following confirmation of the plan. While the Debtors' plan indicates that net disposable income from the 1987, 1988 and 1989 crop seasons will be applied to unsecured creditors, the plan does not specifically indicate how long it will be in effect.

The Bank's base rate on standard farm loans is 12% and on real estate loans is 11.5%, with one point paid up front. The base rate is available for the Bank's best customers. The Bank's interest rate policy sheet indicates that the Bank will be flexible on real estate rates, if need be. However, customers who do not meet the Bank's credit requirements for the base interest rate will pay a higher interest rate. The Bank did not indicate what its credit requirements are for various interest rates. The Bank is currently paying 5%—7½% interest on its certificates of deposit, and 10 year treasury rates are yielding 8.56%.

### Conclusions of Law

The Bank makes the following objections to the plan:

(1) it did not have sufficient opportunity to review the Modified Chapter 12 Plan and that it is improper to file the Modified Chapter 12 Plan (Second Modification), after the hearing. The Bank alleges that the lack of sufficient notice to examine the Modified Chapter 12 Plan deprived them of a fair hearing, and due process,

(2) the adversary proceeding must be resolved before a plan can be confirmed,

(3) lack of good faith,

(4) lack of feasibility,

(5) lack of operating funds for 1987,

(6) real estate taxes of $1,786.00 should not be deducted from the $101,000.00 dollar value of the Bank's real estate in determining the Bank's secured claim,

(7) terms of proposed treatment of the Bank's claim is excessive and interest rates are insufficient. The Bank also raises other objections which are either completely without merit or which have been satisfied by the May 18, 1987, plan.

■ The Bank's claim that they did not have sufficient opportunity to review the Modified Chapter 12 Plan is without merit. The Modified Chapter 12 Plan is slightly over six pages long. It is similar to the first Chapter 12 plan, but for adjustments resulting from the valuation hearing, and various changes of interest rates and repayment terms to secured creditors. The

Bank's counsel has considerable experience with bankruptcy matters, and is fully capable of analyzing a simple, six-page Chapter 12 plan within a day's time. The Modified Chapter 12 Plan (Second Modification) filed May 18, 1987, pursuant to this court's director at the confirmation hearing changes the U.S. Trustee's fees to ten percent of all payments under the plan, and includes an amortized calculation for each creditor, based on the repayment terms in the Modified Chapter 12 Plan. These changes are principally of form, not substance and the Modified Chapter 12 Plan (Second Modification) can be considered without prejudicing the Bank's rights. Counsel must keep in mind that Chapter 12 is designed to proceed much more rapidly than Chapter 11 and this court intends to carry out the intent of Congress in this regard.

■ The Bank's second objection is that the adversary proceeding must be resolved before the plan is confirmed. The court disagrees. Trials on adversary proceedings are not normally set until at least 120 days after the action has been joined. The above proceeding was commenced April 7, 1987. Thus, the matter will not come on for trial until sometime next fall, far beyond the time when this case must be disposed of. Furthermore, based upon the testimony at the confirmation hearing concerning the facts surrounding the adversary proceeding, and this court's recent holding in *In re Kingsley*, 73 B.R. 767 (1987), it appears that the Bank's chance of succeeding on the nondischargeability action is minimal. Obviously, this court's comments regarding the adversary proceeding are not controlling on later dispostion of that proceeding. However, the Bank's security agreement appears to violate North Dakota Century Code § 35–05–04. Furthermore, the required element of malice, essential to a section 523(a)(6) action, appears to be lacking. *See, e.g., In re Long*, 774 F.2d 875, 880 (8th Cir.1985), *In re Vandrovec*, 61 B.R. 191, 196–98 (Bankr.D.N.D.1986). It also appears to the court that the intent to convert element of a section 523(a)(4) action is also lacking.

The Bank's contention that the Debtors' plan was filed in bad faith is also meritless.

■ The Bank's allegation that the plan is not feasible has not been established. The principal dispute regarding the feasibility question centers on the Debtors' average production for wheat. Eugene and Steve Edwardson testified that the averages they used excluded the severe losses from hail during recent years. Because the Debtors will fully insure their crop against hail, any loss will be compensated for. Thus, the 37 bushel per acre yield which the Debtors project is realistic. Based upon the Debtors' projected cash flow the court believes that the plan is feasible. The Debtors also have access to the management expertise of their son, which should be of great benefit to them. The Debtors' cash flow also indicates that they have sufficient operating funds for 1987.

The Bank believes that its secured claim should be $101,000.00, and that it is improper to deduct from its claim real estate taxes of $1,786.00. Real estate taxes levied subsequent to a real estate mortgage, constitute a prior lien to a mortgage lien. *Fischer v. Hoyer*, 121 N.W.2d 788, 793 (N.D. 1963); *see also*, N.D.Cent.Code § 57–02–40 (1983). The value of the Bank's secured claim is $99,214.00.

■ The Bank's final objection which the court will consider is that the term of its payments are unreasonable and that the interest rate is inadequate. The court does not believe the term of payments are unreasonable. However, the interest rate of eight percent is not adequate.

Section 1225 provides that the court shall confirm a plan with respect to each allowed secured claim provided that "the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim ...".

11 U.S.C. § 1225(a)(5)(B)(ii).

In order for a creditor to receive value, as of the effective date of the plan, at least equal to the allowed amount of its claim, its

payments under the plan must be discounted by an appropriate rate, thus providing for present value. The Debtors propose to use a discount or interest rate of eight percent on both the real estate and machinery claims of the Bank which the Debtors argue exceeds the real estate capitalization rate of 7.3% as testified to at the valuation hearing. The Eighth Circuit has on previous occasions provided that, in determining the present value of claims,:

> [T]he appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8th Cir.1986) (quoting *In re Monnier Brothers,* 755 F.2d 1336, 1339 (8th Cir.1985) (quoting 5 Collier on Bankruptcy ¶ 1129, at 1129–65)). The *Neal Pharmacal* court concluded that the bankruptcy court's sole reliance on a creditor's "cost of borrowing without consideration of the risk of nonpayment, the length of the payment period, and the existence of collateral is clearly contrary to the prevailing market rate approach referred to in *Monnier Bros.* and adopted by other courts that have considered the issue under section 1129(a)(9)(c)." *United States v. Neal Pharmacal Co.,* 789 F.2d at 1286. The language of section 1225(a)(5)(B)(ii) is virtually identical to the language of sections 1129(b)(2)(A)(i)(II) and 1129(a)(9)(C), and thus, this court considers the Eighth Circuit's pronouncement in *Monnier Brothers* and *Neal Pharmacal* to be controlling in the Chapter 12 context as well. The Debtors propose to pay the Bank an interest or discount rate of eight percent on its secured claim. However, the Bank's base rate for real estate loans is currently 11½ percent and the Bank's base rate for farm loans is 12 percent.

The court believes that the Bank's claims, in this instance, should be amortized at a 12 percent rate. While the Bank argues that the Debtors should not receive an interest rate such as that available to its best customers, the court disagrees. An individual, such as the Debtor, who within the confines of Chapter 12 has an opportunity to shed several hundred thousand dollars worth of unsecured debt, is not the severe credit risk that the Bank would have the court believe.

The court is not permitted to re-write the terms of a Chapter 12 plan. Thus, the Modified Chapter 12 Plan (Second Modification), currently on file with the court, is not capable of confirmation. However, the court will allow the Debtors to file an amended plan, within ten days of the date of this order. If the plan incorporates the following revisions, it will be confirmed:

(1) provide for payment of real estate taxes under the plan,

(2) more specifically provide for the duration of the plan, and

(3) reamortize the Bank's secured debt at a twelve percent interest rate.

Payments on the Bank's secured claim, based on a twelve percent interest rate, would increase the November 30, 1987, payment approximately $2,000.00, and the November 30 payments thereafter approximately $4,000.00. The Debtors' cash flow is sufficient to handle this payment. Thus, a plan filed in conformity with this court's comments, would be feasible.

Accordingly, and for the reasons stated herein, the Debtors' Modified Chapter 12 Plan (Second Modification) is NOT CONFIRMED.

IT IS SO ORDERED.