**In re Dwight A. FOSS, Debtor.**

**Bankruptcy No. 86–05779.**

United States Bankruptcy Court, D. North Dakota.

July 16, 1987.

James Britton, Rolla, N.D., for debtor.

Brad Sinclair, Fargo, N.D., for Production Credit Assn.

Jon Brakke, Fargo, N.D., for Federal Land Bank of St. Paul.

Gary Annear, Fargo, N.D., for U.S.A.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is consideration of motions to dismiss the Chapter 11 bankruptcy case of Dwight A. Foss (Debtor) filed by Federal Land Bank of St. Paul (FLB) and Production Credit Association (PCA). The Debtor filed for Chapter 11 relief on September 8, 1986. FLB filed its Motion To Dismiss March 27, 1987, alleging that the Debtor is incapable of reorganizing. PCA, in its motion of June 2, 1987, alleges that the Debtor's case should be dismissed for cause including continuing loss to or diminution of the estate, absence of a reasonable likelihood of rehabilitation, inability to effectuate a plan of reorganization, and unreasonable delay by the Debtor that is prejudicial to the creditors. PCA also argued at the July 7, 1987 hearing on these motions that the Debtor's Chapter 11 case was filed, and is being consummated, in bad faith, as allegedly evidenced by filing of the petition prior to foreclosure, filing of a disclosure statement and plan as a delaying tactic, the operation not being a viable economic unit, and by the transfer by the Debtor of all his real estate to an out-of-state trust. The unsecured creditors' committee opposes dismissal at this time. Based upon the record and evidence as introduced at the hearing, the court finds the facts to be as follows:

### Findings of Fact

The Debtor is a grain and sugar beet farmer in eastern North Dakota. The Debtor's farming operation consists of approximately 552 acres, all of which are owned by the Debtor. From the years 1980 through 1984, the Debtor incurred expenses ranging from approximately $52,000.00 to approximately $83,000.00 per year, exclusive of expenses for family living, interest, and depreciation of equipment. The average expenses during this time period were $67,000.00 per year. During these years, the Debtor had a net profit ranging from $12,000.00 to $51,000.00 per year, with the average net profit being $44,568.00, exclusive of interest and family living expenses. Thus, an average of $20,000.00 to $30,000.00 was available annually to service debt. The Debtor has historically raised small grains and sugar beets. In 1983, the Debtor had completed harvesting

of his sugar beets and had them placed in a pile owned by the sugar beet cooperative through which the Debtor markets his sugar beets. An early snow and freezing conditions that year caused damage to sugar beets raised by other growers. As a member of the cooperative, the Debtor was forced to incur his pro rata share of the damages, which resulted in approximately a $30,000.00 loss. This loss appears to be of a non-recurring type, and had the extra $30,000.00 been included in the five year average, the Debtor would have had an additional $5,000.00 per year available for debt service. The Debtor's income and expense figures for 1985 and 1986 are not particularly useful as an indicator of current expenses as the Debtor rented out most of his farmland in 1985 and all of his farmland in 1986.

Presently, the Debtor is again farming his own land. The Debtor currently has 287.8 acres of wheat planted and 93 acres of sugar beets. The Debtor's wheat is above average, and the Debtor expects a 35 to 40 bushel yield on the wheat. The Debtor's sugar beets are much above average at this time. The Debtor projected a sugar beet yield of 16 ton per acre. However, based upon current conditions, the Debtor expects his sugar beets to yield in excess of 20 ton per acre. Based upon a sugar beet price of $35.00 per ton, the additional 4 ton per acre should yield the Debtor approximately $13,000.00 in excess of his current projections, with very little additional expense. Based upon the Debtor's income from sugar beets, wheat, and government farm payments, the Debtor projects a gross income for 1987 of $102,617.00. This includes approximately $20,832.00 of beet income which will not be received until sometime in 1988. The Debtor projects direct farm expenses for 1987 of $41,894.00, plus family living expenses of $12,000.00. Based upon these projections, the Debtor would have approximately $49,000.00 at the end of 1987 available for debt service. The Debtor, however, testified that these figures appear to be conservative, and that in view of this year's crop potential, the income may well be surpassed. The Debtor's projected expenses

for 1987 are lower than they have historically been. However, the Debtor testified that "generally costs of farming" are lower now than when he was farming the land back in 1984. Lower per unit input costs, lower fertilizer costs caused in part by additional summer follow to comply with government farm program requirements, a lower family living budget, and generally increased attention to cutting costs has contributed to the lower projected expenses. Based upon the expenses the Debtor has incurred thus far for the 1987 operating season, his projections do appear to be at least partially rooted in reality.

It came to the court's attention at the hearing that the Debtor has recently conveyed his interest in the real property to an out-of-state trust by virtue of a Deed of Trust and Assignment of Rents. This document states, however, that the deed is "subject to any mortgage or deed filed prior". The Debtor testified that this deed of trust was not given to thwart the efforts of various creditors to eventually foreclose on the property, but was given based upon representations that financing would be provided for the Debtor to pay off all of his creditors. While the court is not impressed with this transfer, as was made abundantly clear at the hearing, the Debtor's testimony will nevertheless be believed as it has not been impeached.

The Debtor has presently filed a disclosure statement and plan. The plan on file does not appear to be capable of confirmation. The Debtor has calculated payments to creditors under the plan based upon the amount of secured creditors' indebtedness as of the time of filing. This is not the standard, as fully secured creditors' claims continue to accrue interest post-petition. Furthermore, while no testimony was introduced at the hearing as to the market rate of interest which should be applied to the secured creditors' indebtedness in amortizing payments, the court, based upon its general knowledge of interest rates, does not believe that the 8% rate used to amortize the secured debt to PCA and FLB will prove to be adequate.

As of April 13, 1987, FLB's claim was in the amount of $202,097.24. With interest accruing at a per diem rate of $63.45, the total indebtedness to FLB as of the July 7 hearing was $208,124.99. This indebtedness is secured by a first mortgage on the Debtor's real property valued at $331,500.00, FLB stock, although not specifically valued in the disclosure statement it is listed on the Debtor's petition at $6,700.00, at checks made jointly payable to the Debtor and FLB in the amount of $4,961.52.

The Debtor's debt to Farmers Home Administration as of the date of filing was $111,208.00. Based upon a per diem interest rate of $13.70 per day, as testified to at the April 13 hearing, accrued interest in the amount of $4,110.00 is also owed FmHA for a total indebtedness of $115,318.00. This indebtedness is secured by a second mortgage on the real estate mortgaged to FLB.

PCA was owed approximately $161,398.27 as of the date of filing. This indebtedness is secured by a third mortgage on the Debtor's real estate mortgaged to FmHA and FLB, machinery valued at $31,000.00, stock in PCA in the amount of $14,250.00, checks made payable jointly to the Debtor and PCA in the amount of $1,847.35 and beet stock valued at $50,400.00. The Debtor also has unsecured creditors owed approximately $30,000.00, exclusive of any undersecured portion of secured creditors' indebtedness. The Debtor also owes approximately $11,046.85 in back taxes on the real estate mortgaged to FLB, FmHA, and PCA.

### Conclusions of Law

Creditors have the burden of proving absence of a reasonable likelihood of rehabilitation and continuing loss or diminution of the estate, both constituting cause for dismissal pursuant to section 1112. *See In re Zahniser*, 58 B.R. 530, 536 (Bankr.D.Colo.1986); *In re Greene*, 57 B.R. 272, 276 (Bankr.S.D.N.Y.1986); *In re Economy Cab & Tool Company, Inc.*, 44 B.R. 721, 724 (Bankr.D.Minn.1984). Once a moving party has met its burden under section 1112(b), the court has broad discretion to consider the best interest of creditors and determine whether to dismiss or convert a particular case. *See In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985); *In re Denrose Diamond*, 49 B.R. 754, 756 (Bankr.S.D.N.Y.1985); *In re Galvin*, 49 B.R. 665, 668 (Bankr.D.N.D. 1985). For a section 1112 motion to be granted on the basis of section 1112(b)(1), a two-fold test must be met: continuing loss to, or diminution of the estate and absence of a reasonable likelihood of rehabilitation. *In re Greene*, 57 B.R. at 276; *In re Powell Bros. Ice Co.*, 37 B.R. 104, 107 (Bankr.D. Kan.1984). The evidence before the court does not specifically establish a continuing loss to the estates although it appears that the value of the estate's assets has declined up until April 16, 1987.

The pivotal issue in this matter is whether any reasonable likelihood of rehabilitation exists. Whether the proposed plan is capable of confirmation is not the issue. The court cannot make a determination as to the likelihood of rehabilitation without doing its own calculations as to the value of the Debtor's collateral, the value of particular claims, and setting forth reasonable terms of repayment. Preparing such an analysis is, in essence, preparing a potential plan. However, the Eighth Circuit in *In re Ahlers*, 794 F.2d 388 (8th Cir.1986), proceeded in a similar fashion in determining whether a successful reorganization was possible in the context of a relief from stay motion. *Id.* at 410–416. While bankruptcy courts are not in the business of drafting plans, potential treatment of creditors under a plan must be considered in resolving this motion. Thus, the court will discuss the claims, security, and annual repayment figures for various creditors.

The claim of FLB is presently $208,124.99. This claim is secured by a first mortgage on real estate valued at $331,500.00. This property is encumbered by delinquent real estate taxes in the amount of $11,046.85. Real estate taxes levied subsequent to a real estate mortgage, constitute a prior lien to a mortgage lien. *Fischer v. Hoyer*, 121 N.W.2d 788, 793

(N.D.1963); *see also*, N.D.Cent.Code § 57–02–40 (1983). Thus, it is appropriate to deduct the real estate taxes from the fair market value of the real estate, leaving a fair market value of the real estate available to creditors in the amount of $320,453.51. *See In re Edwardson*, 74 B.R. 831 (Bankr.D.N.D.1987). FLB also has security in $6,700.00 of stock, and checks payable to the Debtor and FLB in the amount of $4,961.52. Thus, FLB's total security is $332,114.67. After deducting the value of FLB's claim, remaining equity land is $123,989.68.

FmHA has a claim in the amount of $115,318.00. This claim is secured by a second mortgage on the real estate mortgaged to FLB. Thus, after deducting FmHA's claim from the remaining equity in the real estate, $8,671.68 of equity remains as security for PCA, the third mortgagee on the real estate.

PCA's claim as of the date of filing was $161,398.27. This claim is secured by the following collateral:

| | |
|---|---|
| Land | $8,671.68 |
| Machinery | $31,000.00 |
| Stock | $14,250.00 |
| Joint check | $1,847.35 |
| American Crystal Beet Stock | $50,400.00 |
| TOTAL SECURITY | $106,169.03 |

PCA has a secured claim of $106,169.03 and an unsecured claim of approximately $55,229.24.

 FLB's claim in the amount of $208,124.99 is fully secured. If the Debtor proposes a plan which proceeds to confirmation pursuant to section 1129(b)(1), FLB must receive on account of its secured claim payments totalling at least the allowed amount of the claim of a value as of the effective date of the plan of at least the value of the creditors' interest in the estate's interest in the property. 11 U.S.C. § 1129(b)(2)(A)(i)(II). Thus, the present value of FLB's secured claim must be protected. *See In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 652–53 (11th Cir. 1983). When payments are made over time the interest rate that is used determines whether or not the creditor is being paid the present value of its allowed secured claim. *In re Citrowske*, 72 B.R. 613, 617 (Bankr.D.Minn.1987). Assuming that the Debtor would turn over the checks made payable jointly to the Debtor and FLB in the amount of $4,961.52, FLB's remaining secured claim would be $203,163.47. The Debtor apparently believes that this secured claim can further be reduced by the value of the FLB stock. This court believes that it is improper for the Debtor to retire or cancel FLB or PCA stock as part of his Chapter 11 plan. *In re Walker*, 48 B.R. 668, 669 (Bankr.D.S.D.1985). FLB and PCA are given the *sole discretion*, under federal law, to cancel stock and apply to customer loans. *See* 12 U.S.C. § 2034(a); 12 U.S.C. § 2094(k). Stock can only be cancelled at the direction of FLB or PCA, and cannot be cancelled upon the direction of the Debtor. Moreover, this court cannot read section 1129(b) to override the specific intent of Congress, in enacting the Farm Credit Act, to design a capital structure dependent upon long term direct borrower participation. Thus, neither the claims of FLB or PCA may be reduced by the value of the Debtor's stock in the respective organizations. The Debtor proposes to amortize FLB's claim at an 8% interest rate. If amortized at 8% over 30 years, the Debtor's annual payments would be $17,781.00 per year. However, if this claim was amortized at a 12% interest rate over 30 years, the rate at which this court on at least two previous occasions has determined to be the fair market rate of interest for FLB loans, the Debtor's annual payment would be $25,221.00. *See In re Eisenbarth*, 77 B.R. 228 (Bankr.D.N.D.1987); *In re Edwardson*, 74 B.R. 831 (Bankr.D.N.D.1987).

The Debtor proposes to amortize FmHA's claim in the amount of $115,318.00 over forty years at a 5% interest rate. Based upon this proposal, the Debtor's annual payments to FmHA would be $6,058.27.

The Debtor proposes to amortize PCA's claim at an 8% interest rate over various periods of time, depending upon the type of

collateral upon which the secured claim is based. The total value of PCA's secured claim is $106,169.03. Assuming the Debtor would turn over the checks payable jointly to himself and PCA in the amount of $1,847.35, the amount of PCA's secured claim which would need to have its present value protected over a period of time would be $104,321.68.

The Debtor proposes to pay PCA's debt in the amount of $8,671.68, which is secured by real estate, at an 8% interest rate. If amortized over 30 years, the amount of this annual payment would be $770.28. If amortized at a 12% interest rate, the amount of the payment would be $1,076.53. Likewise, the Debtor proposes to amortize PCA's stock in the amount of $14,250.00 over 30 years at 8% with annual payments of $1,265.79. If these payments were amortized at a 12% interest rate, annual payments would be $1,769.05. The Debtor proposes to amortize PCA's claim secured by machinery in the amount of $31,000.00 over 5 years at 8% interest, or $7,764.15 per year. At a 12% interest rate, annual payments would be $8,599.70 per year. The Debtor also proposes to amortize PCA's claim secured by American Crystal Beet stock in the amount of $50,400.00 over 20 years at 8% or $5,133.35 per year. If amortized at 12%, annual payments would be $6,747.49. Based upon the Debtor's proposed and the court's hypothetical treatment of secured creditors, annual payments under the various interest rates would be as follows:

| Creditor | Debtor's Proposed Interest Rate | Likely Interest Rate |
|---|---|---|
| FLB | $18,046.49 | $25,221.00 |
| FmHA | $ 6,058.27 | $ 6,058.27 |
| PCA (real estate) | $ 770.28 | $ 1,076.53 |
| PCA (machinery) | $ 7,764.15 | $ 8,599.70 |
| PCA (stock) | $ 1,265.79 | $ 1,769.05 |
| PCA (beet stock) | $ 5,133.35 | $ 6,747.49 |
| Total Annual Payments | $39,038.33 | $49,472.04 |

Approximately $85,000.00 of unsecured debt is outstanding when the unsecured debts plus the undersecured portion of PCA's claim are added together. The Debtor would presumably make a percentage payment on this debt over a period of time, in the amount of $1,000.00 to $2,000.00 per year. The Debtor may also have some minor administrative expenses in the form of attorney's fees. Adjustment for payment of the Debtor's real estate taxes including present taxes and arrearages, do not need to be added on to the annual payment schedule, as they are included in the Debtor's cash flow expense projections. Thus, based upon a 12% interest rate, the Debtor's payments under the plan would appear to be extremely tight. In fact, based upon the Debtor's projections, they would appear to be $2,000.00 to $3,000.00 less per year than needed. However, based upon the Debtor's interest rates, the Debtor would appear to have approximately an $8,000.00 or $9,000.00 cushion in making potential payments under a plan. It is premature for the court, at this time, to determine what interest rate will need to be used to discount the claims of the secured creditors. No testimony was introduced at the July 7 hearing evidencing the present market rate of interest. Obviously, a one or two percent adjustment from the 12% figure would improve the Debtor's projected ability to cash flow his operation.

This court has often afforded agricultural debtors an added measure of time to reorganize providing a debtor has the means to carry on the farming operation and is making positive gains in that direction. *In re Rott*, 49 B.R. 697, 699 (Bankr.D.N.D.1985). The Debtor is perhaps fortunate that his crops are presently progressing very well, and that he may exceed his projections this year by $15,-000.00 to $20,000.00. If this happens, the Debtor may have a sufficient cushion to carry him through the initial years of a plan, which generally are the most difficult. If the Debtor makes it through five years of a confirmed plan, he would have his machinery payments to PCA paid off, and have additional monies available to fund the plan. However, if the Debtor, at the end of this year's crop season, finds that he is even minimally short of meeting his 1987 projections, despite what appears to be an above average year, the Debtor will in all likelihood be forced to recognize reality and have his case dismissed.

■ The court wants to be clear that its comments and figures as incorporated into a hypothetical plan, are not necessarily binding on this court in the event that these terms are incorporated into a plan and addressed at a confirmation hearing. At that time, both parties will have an opportunity to argue their respective positions. Moreover, this court is not yet convinced that the Debtor's farming operation will eventually reach the point of a successful reorganization. "Sincereity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises". *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985) (quoting *In re Bergman*, 585 F.2d 1171, 1179 (2nd Cir. 1978)). Feasibility must be firmly rooted in predictions based upon objective fact. *In re Clarkson*, 767 F.2d at 420. 1987 is the first year in the past three years that the Debtor has actually farmed all of his land. Thus, the court believes that it is equitable and reasonable to allow the results of the 1987 crop season to be considered. If, in fact, the results and projections for the 1987 season fall short of the Debtor's average cash-flow projections, the case will probably be dismissed. If, however, the projections are met, or exceeded, the Debtor may yet be able to effectuate a successful reorganization. The Debtor is urged, however, to proceed expediously in obtaining approval of a disclosure statement, and circulating a plan. It would be unwise for the Debtor to wait until the completion of the 1987 crop season before pressing forward to confirmation.

The court concludes that PCA's grounds for dismissal based upon bad faith are meritless at this time.

Accordingly, and for the reasons stated herein, the motions by Federal Land Bank and Production Credit Association to dismiss the Debtor's Chapter 11 bankruptcy proceeding are DENIED without prejudice.

IT IS SO ORDERED.