In re Lawrence B. BURRIS, d/b/a # 96 Cattle Company, Burris–Dolan, Burris Farms and Burris–Goldsborough, SSN 446–42–0302, Debtor.

Bankruptcy No. 88–71006.

United States Bankruptcy Court, E.D. Oklahoma.

Aug. 3, 1989.

A. Camp Bonds, Jr., Muskogee, Okl., for debtor.

G. Blaine Schwabe, III, Oklahoma City, Okl., for Farm Credit Bank.

## ORDER

JAMES E. RYAN, Bankruptcy Judge.

On this 3rd day of August, 1989, this Court considered the Legal Memoranda filed by the Debtor (Docket Entry Nos. 247 and 248) and Farm Credit Bank (FCB) (Docket Entry No. 249).

Two legal issues must be decided by this Court prior to the submission of the Debtors' Second Amended Plan and a hearing on confirmation of same.

## STATEMENT OF ISSUES

1. (a) Whether FCB possesses a lien on the proceeds derived from oil and gas production from beneath the surface of the mortgaged property under the terms of the Note and Mortgage between the parties; and

(b) If so, whether FCB must be paid one hundred percent of said oil and gas income derived from the mortgaged premises under the Debtor's Plan in order for compliance with 11 U.S.C. § 1129(b)(2)(A)(i)(II) to be found.

2. What is the appropriate standard for determination of the discount or interest rate to be paid on an allowed secured claim under a Plan of Reorganization pursuant to 11 U.S.C. § 1129(b).

After review of said Legal Memoranda, this Court does hereby enter into the following Findings of Fact and Conclusions of Law in this core proceeding:

## FINDINGS OF FACT

1. On August 23, 1988, the Debtor filed a Petition seeking relief under Chapter 11 of the United States Bankruptcy Code.

2. By Agreed Order between the parties entered on May 9, 1989, the amount of the secured claim of Farm Credit Bank was determined to be $1,127,804.00.

3. The Debtor's Plan proposes to treat FCB over a five year term at a ten percent discount rate to pay the present value of the creditor's allowed secured claim.

4. On June 6, 1989, the Debtor filed a First Amended Plan of Reorganization to which FCB objected. Within said Amended Plan, the Debtor proposed to pay FCB ninety percent of income derived by oil and gas production located under real property upon which FCB possesses a valid mortgage, and retain ten percent of these proceeds for the Debtor's use.

The Mortgage held by FCB states:

"Mortgagor hereby transfers, assigns, sets over and conveys to Mortgagee all rents, royalties, bonuses and delay monies that may from time to time become due and payable under any oil and gas or other mineral lease of any kind now existing, or that may hereafter come into existence, ...."

FCB contends that this grants a security interest in the oil and gas proceeds and thus, it is entitled to receive one hundred percent of all oil and gas production income on this property. For the Debtor's Plan to provide for less than one hundred percent, FCB argues that the creditor's lien is not retained as required by 11 U.S.C. § 1129(b), since the Debtor's Plan as proposed is only confirmable under a "cram down" scenario.

5. The Debtor contends that the language in the Mortgage held by FCB is an assignment of oil and gas proceeds. However, the Debtor further asserts such assignment grants only an inchoate lien upon which FCB may only execute when a default has occurred.

6. Pertaining to the discount or interest rate applied to pay the creditor the present value of its allowed secured claim under a Plan of Reorganization, FCB contends that the appropriate rate is that which is provided for under the contract negotiated between the parties. Alternatively, FCB encourages this Court to adopt a market rate of interest which the Debtor must incorporate under the Chapter 11 Plan.

7. The Debtor contends that the discount rate to be utilized in payment of the creditor's allowed secured claim is ten percent, representing a Treasury Bill rate with additional points added to compensate the creditor for the risk involved in the loaning of funds to the Debtor to fund the Plan.

## CONCLUSIONS OF LAW

■ A. *Issue No. 1(a):* Whether FCB possesses a lien on the proceeds derived from oil and gas production from beneath the surface of the mortgaged property under the terms of the Note and Mortgage between the parties.

The United States Bankruptcy Code at 11 U.S.C. § 1129(b)(2)(A)(i)(I) states:

For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides

(i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claim; ...

Thus, a Plan proposed under this subsection must provide for the retention of a creditor's lien in order to be fair and equitable and thus confirmable under this "cram down" section. *In re Little,* 75 B.R. 128, 130 (Bankr.S.D.Ohio 1987).

B. This Court acknowledges the creditor's reference to Okla.Stat. tit. 12A, § 9–402(5) which provides that:

When a writing constituting a mortgage upon lands, or interests in lands such as oil and gas leasehold estates, also covers minerals to be severed from such lands ... and the accounts and proceeds to be derived from disposition of such minerals contains a legal description of such lands sufficient to comply with Sections 287, 291 and 298 of Title 19 of the Oklahoma Statutes, as amended, has been validly executed, acknowledged and recorded in the office of the county clerk for the county in which such lands are located, such mortgage shall constitute a financing statement covering such collateral and no other filing or recording shall be required to perfect the security interests in such collateral covered by the mortgage.

And further we acknowledge that the mortgages at issue were validly executed, acknowledged and recorded. However, we also find that such perfection of lien is not matured until a default has occurred. Thus, it is in fact an inchoate lien. Just as the mortgage on the real estate which FCB possesses requires foreclosure and formal proceedings demonstrating default before collection may be obtained, the proceeds derived from oil and gas production on these lands must be foreclosed upon, when a default has been demonstrated. "As a result of the filing, all the mortgagee gets is a lien on property, not the right to immediate possession." *In re Metro Square,* 93 B.R. 990, 997 (Bankr.D.Mn.1988) (This case dealt with a similar provision in a mortgage with regard to rents; however, said provision may be analogized to the provision for oil and gas revenue).

C. *Issue No. 1(b):* If so, whether FCB must be paid one hundred percent of said oil and gas income derived from the mortgaged premises under the Debtor's Plan in order for compliance with 11 U.S.C. § 1129(b)(2)(A)(i)(II) to be found.

Since this Court finds that FCB possesses an inchoate lien on the oil and gas proceeds, FCB is not entitled to receipt of one hundred percent of said income in order for a finding to be made that the Debtor's Plan is "fair and equitable." The Plan must provide, however, that upon default, FCB is entitled to payment of oil and gas proceeds in order for the retention of the creditor's lien to be present. However, as has been stated hereinabove, FCB is not entitled to receipt of any of these proceeds until default.

■ D. *Issue No. 2:* What is the appropriate standard for determination of the discount or interest rate to be paid on an allowed secured claim under a Plan of Reorganization pursuant to 11 U.S.C. § 1129(b).

The Bankruptcy Code at 11 U.S.C. § 1129(b)(2)(A)(i)(II) goes further to state "that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the

value of such holder's interest in the estate's interest in such property."

The discount or interest rate is utilized to determine whether the creditor is being paid the present value of its allowed secured claim. *In re Foss*, 76 B.R. 719, 723 (Bankr.D.N.D.1987).

E. In determining the proper interest rate or discount rate, various Courts have relied upon two basic methods of computation:

(i) The contract rate, and

(ii) The market rate.

Contract rate is easily explained as the rate which the parties employed in the mortgage or contract when originally bargained.

Market rate has been interpreted as the rate which would be charged or obtained by the creditor making the loan to a third person on similar terms, duration, collateral and risk. It is in a determination as to the source and formulation of a market rate that confusion has arisen.

F. We find that the contract rate which the creditor encourages this Court to use does not accurately represent the Congressionally intended rate in computing the present value. To decide otherwise would thwart many Chapter 11 reorganizations since the interest rate may have been computed at a time remote to the Plan proposal. During periods of hyperinflation or tight money, an exorbitant interest rate may result. This may have occurred many years prior to the formulation of the Plan of Reorganization. Thus, a reorganization should be viewed contemporaneous with the proposal of the Plan. We therefore reject any usage of the contract rate of interest.

G. Market rate has been formulated on many different levels and scales. The Debtor encourages this Court to use a simplified formula of a stable basis contemporaneous with the Plan (i.e., Treasury Bill rate) with an arbitrary addition of points to this rate to compensate the creditor for any risk associated with the reorganization. See *U.S. v. Doud*, 869 F.2d 1144 (8th Cir. 1989).

FCB contends that the market rate is nearly impossible to compute because of two unique qualities of a bankruptcy reorganization. First, the loan is "coerced" in that in a "cram down" scenario, the Court may impose the terms of the Plan upon the creditor, and second, that financing of one hundred percent of the loan value is difficult if not impossible to obtain in the market place. We reject these arguments. Congress must have contemplated that in most if not all bankruptcy reorganizations a loan would be coerced, or it would not have provided for the cram down circumstance. Further, it must have also been the intent of the framers of the Code that a one hundred percent financing arrangement be included in a proposed Chapter 11 Plan or most if not all reorganizations would be thwarted before the opportunity for success had been fully measured. With the incorporation in the Bankruptcy Code of the "absolute priority rule" by Congress, the potentially unsecured portion of the creditor's claim is protected to the extent of the determined value of the Debtor's reorganized economic unit.

This Court concludes that the most accurate manner of determining a proper and fair interest rate is represented by the following formula, to be utilized by the Debtor in a reorganization plan:

The cost of money to the creditor plus a reasonable rate of return to be charged under the Plan. The method of determining these two factors is readily available—the cost of money is ascertainable from the creditor's source for such funds. The reasonable rate of return may be obtained from records of the creditor who is to be treated under the Debtor's Plan reflecting contemporaneous loans of like term and condition to similar third party borrowers. In determining this reasonable rate of return, a comparison of these third party loans with the Debtor's proposal under the Plan shall concentrate on the similarity in the type of collateral used to secure the loans and the nature of the borrower's/debtor's business. As has been related hereinbefore, the coercion and full fi-

nancing conditions are discounted in this formula.

The acquiring of this information requires the conducting of an evidentiary hearing for its determination. If the creditor resists, the debtor has the avenue available in the form of a Subpoena or Request for Production with Motion to Compel to obtain the required information, since this is a contested matter pursuant to B.R. 9014.

Although this may appear to be a cumbersome method of obtaining a market rate and not as simplified as the Debtor's proposal, it is arguably the most accurate measure reflecting the result which would be obtained outside the bankruptcy arena and providing the most equitable method of obtaining the needed rate.

IT IS THEREFORE ORDERED that the lien on oil and gas proceeds of FCB is an inchoate lien and thus the creditor need not receive one hundred percent of said proceeds by and through the Plan but the Plan shall allow for the retention of lien on these proceeds upon default under said Plan.

IT IS FURTHER ORDERED that a hearing be conducted for the purpose of taking evidence on the market rate charged by FCB to third party mortgagors within a reasonable time contemporaneous with the filing of the Debtor's proposed First Amended Plan and in conformity with the guidelines provided herein. Said hearing shall be conducted on August 17, 1989 at 10:00 a.m. At the hearing, the Debtor shall be informed of a date by which a Second Amended Plan must be filed.